IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JAMES LORANG and MARCIA LORANG,

                            Plaintiffs,                    OPINION & ORDER

        v.
                                                            16-cv-425-jdp
DITECH FINANCIAL LLC,

                            Defendant.

This lawsuit arises from a long-running dispute involving a home owned by plaintiffs, James and Marcia Lorang. The Lorangs defaulted on their home loan, and the owner of the loan, Bank of America, initiated foreclosure proceedings in state court. At some point, the loan was transferred to Ditech Financial LLC, the defendant here. The state-court foreclosure action has nearly run its course, with Ditech securing a judgment of foreclosure against the Lorangs.

This case involves Ditech's conduct during the foreclosure, which the Lorangs contend was dishonest and unfair. The Lorangs bring claims against Ditech for violations of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2605; the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 *et seq.*; the Wisconsin Consumer Act, Wis. Stat. § 224.77; and the implied duty of good faith and fair dealing.

The parties have filed cross-motions for summary judgment. Dkt. 15 and Dkt. 37.[1] The Lorangs have adduced evidence sufficient to raise a genuine dispute of material fact as to one claim under the FDCPA, so that claim will have to be resolved at trial. But the Lorangs have

---

[1] The Lorangs style their motion as one for "partial" judgment: they move for summary judgment on liability and ask that damages proceed to trial.

otherwise failed to adduce evidence to support their claims, and so the court will grant summary judgment in favor of Ditech on all the other claims.

## UNDISPUTED FACTS

Except where noted, the following facts are undisputed.

In 2004, the Lorangs got a loan to buy a house in Fort Atkinson, Wisconsin, and secured the loan with a mortgage. Eventually Bank of America acquired the loan. In 2009, the Lorangs defaulted on the loan, and in December 2012, Bank of America initiated state-court foreclosure proceedings. Soon after, Bank of America assigned the note and mortgage to Ditech. The ins and outs of the protracted state-court litigation are complicated and, for the most part, not relevant here. It suffices to say that Ditech secured a judgment of foreclosure against the Lorangs in May 2016, shortly before the Lorangs filed suit here, on June 16, 2016. (In November 2016, the Lorangs asked this court for a preliminary injunction barring confirmation of the sheriff's sale of their home. Dkt. 19. The court denied that motion. Dkt. 28.)

The main issues in this case involve the communication between Ditech and the Lorangs during the state-court foreclosure action. As the state-court litigation ran its course, Ditech evaluated the Lorangs' "loss mitigation" options, which is to say, the ways in which the Lorangs' loan or payments might be modified to avoid foreclosure. The parties dispute whether the Lorangs submitted a complete loss mitigation application. The Lorangs rely on James's declaration testimony: "We applied for the modification and provided all required documentation for that application, sending everything the application requested." Dkt. 17, ¶ 4. Ditech relies on its business records to show otherwise. Dkt. 33, ¶ 8. The parties agree that

on November 4, 2015, Ditech sent the Lorangs a letter that said their application was incomplete and asked that specified documents be provided by December 4, 2015. Dkt. 1-1.

The parties' communication was complicated by the fact that the Lorangs' counsel changed firms during the course of the case. Ditech sent the November 4 letter to Marcia Lorang, in care of Krekeler Strother, the Lorangs' counsel's former law firm. By November 2015, the Lorangs' counsel, Briane F. Pagel, had moved from Krekeler Strother to Kerkman & Dunn. (In January 2017, Pagel moved again to Lawton & Cates.) So Ditech sent the letter to the wrong address. But Krekeler Strother forwarded the letter to Pagel, and all agree that Pagel received the letter in time to respond. On December 2, 2015, Pagel forwarded the additional documents to Ditech's outside counsel. Ditech's counsel responded, "Thank you. We will forward this information to our client for review." Dkt. 1-2.

Ditech contends that, despite the additional documents, the Lorangs' application remained incomplete. On December 11, Ditech sent a second letter to the Lorangs (again addressed to Marcia Lorang, in care of Krekeler Strother, but this letter, too, was promptly forwarded). The letter said that Ditech had not received a complete loss mitigation application within the specified timeframe. As a result, Ditech would not review the application. Dkt. 1-3.

The Lorangs had other loss mitigation options. On December 12, Ditech sent the Lorangs a letter informing them that they had options to "avoid foreclosure." Dkt. 33-2, at 1. Ditech had approved the Lorangs for a "Trial Period Plan to modify [their] mortgage payment." *Id.* If the Lorangs were able to follow the Trial Period Plan's terms, Ditech would permanently modify their mortgage. *Id.* Once again, Ditech sent the letter in care of Krekeler Strother. But the Lorangs contend that they did not receive this one. Dkt. 17, ¶ 19 ("Neither I [James Lorang] nor my wife ever received . . . a proposed trial modification packet from Ditech."). The

Lorangs did not make any trial payments, and Ditech denied the Lorangs a permanent modification based on the Trial Period Plan.

On December 28, Pagel emailed Ditech's counsel and asked him (1) to make sure that Ditech had Pagel's current contact information, as he had left Krekeler Strother but that firm had received the November 4 letter; and (2) to confirm when Ditech had received the Lorangs' supplemental documents (sent via email on December 2) and that the Lorangs had timely submitted those documents. Dkt. 1-4. Pagel acknowledged that the Lorangs had received the December 11 letter declining to review their application. Ditech did not respond to the December 28 email.

On January 20, 2016, James Lorang sent Ditech a letter requesting "a payoff amount in writing as of February 15, 2016." Dkt. 1-5, at 1. James also requested that Ditech explain how it calculated the payoff amount. *Id.* The parties dispute whether Ditech responded to the letter. According to James, Ditech did not respond. Dkt. 17, ¶ 17. But Ditech says it did, on January 28, 2017. Dkt. 33, ¶ 12 and Dkt. 33-4 (noting payoff amount is $376,935.56 and providing a breakdown of that number). Ditech sent the letter to Marcia Lorang, in care of Kerkman & Dunn. Dkt. 33-4, at 1. (Although by this time Pagel had moved again to Lawton & Cates, there is nothing in the record to show that Ditech had Pagel's newest contact information.)

Ditech maintains a designated address for receiving, reviewing, and responding to qualified written requests for information. That address is P.O. Box 6176, Rapid City, South Dakota 57709-6176. The Lorangs concede that Ditech provided written notice of this address to them on various correspondences. Dkt. 45, ¶¶ 15-16.

The court has subject matter jurisdiction over the Lorangs' RESPA and FDCPA claims pursuant to 28 U.S.C. § 1331, because they arise under federal law. The court may exercise supplemental jurisdiction over the Lorangs' state-law claims pursuant to 28 U.S.C. § 1367.

ANALYSIS

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When the parties have filed cross-motions for summary judgment, the court "look[s] to the burden of proof that each party would bear on an issue of trial; [and] then require[s] that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). If either party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment against that party is appropriate. *Mid Am. Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995) (quoting *Tatalovich v. City of Superior*, 904 F.2d 1135, 1139 (7th Cir. 1990)). "As with any summary judgment motion, this [c]ourt reviews these cross-motions 'construing all facts, and drawing all reasonable inferences from those facts, in favor of . . . the non-moving party.'" *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008) (quoting *Auto. Mechs. Local 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 748 (7th Cir. 2007)).

"[S]ummary judgment 'is the "put up or shut up" moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'" *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (quoting *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). A mere "scintilla of evidence" is not enough to survive. *Pugh v. City of Attica*, 259 F.3d 619, 625 (7th Cir. 2001).

## A.  RESPA

"RESPA is a consumer protection statute that regulates the real estate settlement process, including servicing of loans and assignment of those loans." *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 680 (7th Cir. 2011) (citing 12 U.S.C. § 2601 (congressional findings)). Under RESPA, a servicer must respond to borrower inquiries:

> If any servicer of a federally related mortgage loan receives a qualified written request from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 5 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period.

§ 2605(e)(1)(A). A "qualified written request"—or QWR—is any "written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that . . . includes, or otherwise enables the servicer to identify, the name and account of the borrower; and . . . includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." § 2605(e)(1)(B).

Here, the Lorangs contend that Ditech did not respond to two QWRs: Pagel's December 28, 2015 email, and James Lorang's January 20, 2016 letter. The Lorangs further

contend that Ditech did not reasonably evaluate their loss mitigation application, in violation of RESPA regulations, 12 C.F.R. § 1024.41.[2]

### 1. QWRs

A servicer must respond to QWRs in certain ways and within certain timeframes. *Ploog v. HomeSide Lending, Inc.*, 209 F. Supp. 2d 863, 868 (N.D. Ill. 2002). But neither the December 28, 2015 email nor the January 20, 2016 letter triggered Ditech's duty to respond.

First, the Lorangs have not shown that Ditech received the December 28, 2015 email. Pagel sent it to Ditech's outside counsel. RESPA allows borrowers *and their agents* to send QWRs, but the servicer—not the servicer *or its agent*—must receive the QWR before the duty to respond kicks in. The Lorangs summarily contend that "[t]here is no doubt that Ditech *received* the email correspondence." Dkt. 35, at 2. But they have not adduced any evidence that Ditech, as opposed to its counsel, received the email. So they cannot maintain a claim for Ditech's failure to respond to it. *See Todd v. ShoreBank*, No. 12-cv-6575, 2013 WL 3790966, at *4 (N.D. Ill. July 19, 2013) ("[S]ince § 2605 imposes a time requirement on servicers to respond to borrower inquiries, a letter sent to [the former loan servicer] could not trigger a duty to respond for [Urban Partnership Bank, the current servicer]. Plaintiff's Complaint never alleges this letter was sent to UPB."); *see also Catalan*, 629 F.3d at 688 (The borrowers satisfied RESPA's requirement "that qualified written requests be received 'from the borrower (or an agent of the borrower)'" when the borrowers sent a letter to HUD and HUD forwarded the letter to the servicer.).[3] The Lorangs argue, without support, that if the borrower's agent can

---

[2] "A borrower may enforce the provisions of this section pursuant to section 6(f) of RESPA (12 U.S.C. 2605(f))." 12 C.F.R. § 1024.41(a).

[3] Several extra-circuit district courts have held that RESPA's plain language requires that the servicer—not its counsel—receive the QWR before it is required to respond. *See Turner v. Wells*

send a QWR, then the *servicer's* agent should be able to receive one. But that is not what the statute provides. RESPA may not require a borrower to send a QWR to the servicer directly, but the servicer must receive it before its duty to respond kicks in.

The email did not trigger the duty to respond for a second reason: the Lorangs did not send it to Ditech's designated QWR address. "Under RESPA, a servicer may limit its response obligations by designating an exclusive address where it may receive borrower inquiries." *Messina v. Green Tree Servicing, LLC*, 210 F. Supp. 3d 992, 1007 (N.D. Ill. 2016). RESPA regulations provide that

> [a] servicer may, by written notice provided to a borrower, establish an address that a borrower must use to submit a notice of error in accordance with the procedures in this section. . . . If a servicer designates a specific address for receiving notices of error, the servicer shall designate the same address for receiving information requests pursuant to § 1024.36(b).

12 C.F.R. § 1024.35(c).[4] Put simply, a servicer may designate an address for QWRs; the Lorangs acknowledge as much. *See* Dkt. 35, at 4. And borrowers *must* send QWRs to the

---

*Fargo Bank, NA*, No. H-13-808, 2014 WL 3535343, at *5 (S.D. Tex. July 16, 2014) ("The only correspondence from Plaintiff in the summary judgment record is a letter addressed to . . . the law firm representing Defendant in the foreclosure of the Property. RESPA requires that a servicer respond when it receives a qualified written request. There is no evidence of record that Defendant received Plaintiff's August 30, 2011 letter, which was addressed to its outside counsel, not to Defendant." (footnote omitted)); *Griffin v. Citifinancial Mortg. Co.*, No. 05-cv-1502, 2006 WL 266106, at *2 (M.D. Pa. Feb. 1, 2006) ("Here, Citifinancial, the servicer, did not receive a request from a borrower or the borrower's agent. Rather, the servicer's outside counsel received a request from the borrower's agent. Thus, under the plain language, Citifinancial had no duty to respond under the RESPA provisions in question.").

[4] "A qualified written request is just one form that a written notice of error or information request may take. Thus, the error resolution and information request requirements in §§ 1024.35 and 1024.36 apply as set forth in those sections irrespective of whether the servicer receives a qualified written request." 12 C.F.R. Pt. 1024, Supp. I (official Bureau of Consumer Financial Protection interpretations). In other words, the regulation discusses "notices of error" and "information requests," but it covers QWRs.

designated address; "borrowers who fail to submit their QWRs to that location do so at their peril." *Catalan v. RBC Mortg. Co.*, No. 05-cv-6920, 2008 WL 2741159, at *5 (N.D. Ill. July 8, 2008). That is, provided the servicer gives the borrower written notice of the designated address, and provided the notice is "clear and conspicuous." 12 C.F.R. § 1024.32(a)(1).[5]

Here, Ditech designated an address for QWRs, and it notified the Lorangs of that address in writing, clearly and conspicuously. Ditech's November 4 and December 11, 2015 letters to the Lorangs provided: "Ditech has designated the following address where mortgage loan customers must send any Qualified Written Request, Notice of Error, or Request for Information: PO Box 6176 Rapid City SD 57709-6176." Dkt. 1-1, at 2 and Dkt. 1-3, at 1.[6] The notice appeared in the body of the relatively short letters and in the same size font as the rest of the content. So the Lorangs were required to send all QWRs to the designated address. The December 28, 2015 email did not trigger the duty to respond. *See Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1147 (10th Cir. 2013) ("[A] servicer's receipt of a QWR *at the designated address* is required to trigger RESPA duties and liability under § 2605." (emphasis added)); *Roth v. PNC Bank, N.A.*, No. 15-cv-4779, 2015 WL 5731892, at *3 (N.D. Ill. Sept. 30, 2015) ("Because Plaintiffs' attachments unequivocally show that Plaintiffs' February 2014 correspondence was not sent to the designated address, Plaintiffs' February 2014 QWR cannot be a basis of their RESPA claim.").

---

[5] "A notice establishing an address that a borrower must use to assert an error may be included with a different disclosure, such as a notice of transfer. The notice is subject to the clear and conspicuous requirement in § 1024.32(a)(1)." 12 C.F.R. Pt. 1024, Supp. I.

[6] The undisputed facts show that the Lorangs received the November 4 and December 11 letters before Pagel sent the December 28 email, even though Ditech mailed the letters in care of Krekeler Strother. *See* Dkt. 17, ¶ 7 and Dkt. 1-4.

The January 20, 2016 letter fares no better. Although James Lorang sent the letter to Ditech and Ditech received it, he did not send it to the designated QWR address. *See* Dkt. 1-5. So it did not trigger the duty to respond. The Lorangs cannot maintain a claim for Ditech's failure to respond to a QWR.

### 2. Loss mitigation procedures

The remaining RESPA claims involve purported violations of RESPA's Regulation X, 12 C.F.R. § 1024.41. The Lorangs' claims are difficult to discern. They generally contend that Ditech "did not evaluate the Lorangs' modification application as required by federal regulations." Dkt. 16, at 4. But they have trouble getting more specific than that. They identify what they contend are three requirements under § 1024.41: (1) a servicer must "exercise reasonable diligence in obtaining documents . . . to complete a loss mitigation application," (2) loss mitigation applications must "remain[] incomplete for a significant period of time" before being denied for incompleteness, and (3) a servicer must notify the borrower of his loss mitigation options once the servicer receives a complete loss mitigation application. *Id.* at 4-5 (quoting 12 C.F.R. § 1024.41(b)(1), (c)(2)(ii)) (citing § 1024.41(c)(1)(ii)). Then the Lorangs summarily contend that Ditech violated the requirements when it sent letters in care of Krekeler Strother (instead of Kerkman & Dunn), when it declined to review the Lorangs' incomplete application just nine days after the Lorangs submitted additional documents, and when it did not give the Lorangs mitigation options after they completed their application. In their reply brief, the Lorangs stir the already muddied water: in one short paragraph, they summarily argue that Ditech violated § 1024.41 (no subsection specified) because the Lorangs never received the December 12 letter and because Ditech never responded to counsel's

December 28 email. Dkt. 35, at 10. The Lorangs do not mention *any* violations of § 1024.41 in their response to Ditech's motion for summary judgment.

The court could reject the Lorangs' claims under § 1024.41 because they are not presented clearly enough to evaluate them. But court will give the Lorangs the benefit of the doubt and address each of the regulation's subsections that the Lorangs have cited in their papers.

First, the Lorangs cannot maintain a claim under § 1024.41(c)(2)(ii). That subsection provides that "a servicer may, in its discretion, evaluate an incomplete loss mitigation application and offer a borrower a loss mitigation option" after the application has sat incomplete for a "significant period of time." The Lorangs appear to read the regulation as though it imposes certain limits on servicers: that servicers cannot decline to evaluate an incomplete application without waiting a "significant period of time." But the regulation's plain language does not support that reading. Rather, the regulation is clear that a servicer may evaluate an incomplete application, if it wants, under certain circumstances. Ditech's decision to decline to evaluate the Lorangs' incomplete application (assuming it was incomplete for purposes of this subsection) after nine days did violate this subsection. Tellingly, the Lorangs appear to have abandoned this theory in their reply brief.

Second, the court considers § 1024.41(b)(1). The Lorangs do not explain how a few misaddressed letters amount to a violation of § 1024.41(b)(1). That subsection requires a servicer to "exercise reasonable diligence in obtaining documents and information to complete a loss mitigation application." The regulation's Official Bureau Interpretations explain that a servicer must be reasonably diligent in its efforts to evaluate a borrower "as to all . . . loss mitigation options available to the borrower." 12 C.F.R. Pt. 1024, Supp. I. For example, a

"servicer must continue its efforts to obtain documents and information from the borrower that the servicer requires to evaluate the borrower for all other available loss mitigation options," even after the servicer confirms that certain loss mitigation options are not available. *Id.* And a "servicer may not stop collecting documents and information from the borrower pertaining to available home retention options solely because the borrower has indicated . . . a preference" for other loss mitigation options. *Id.* "Diligence" means contacting the borrower promptly when the servicer knows that it needs more information. *Id.* Without a better explanation from the Lorangs, the fact that Ditech sent a few letters in care of Pagel's former firm—letters that the Lorangs did eventually receive and respond to—does not amount to a violation of § 1024.1(b)(1). Again, the Lorangs do not mention the claim in their reply brief. As already discussed, the Lorangs have not adduced any evidence that Ditech itself received the December 28 email. Its purported failure to respond to that email cannot amount to a violation of RESPA regulations.

Third, the court considers § 1024.41(c)(1)(ii). The Lorangs have adduced some evidence that they submitted a complete loss mitigation application, which goes to whether Ditech violated § 1024.41(c)(1)(ii). Subsection (c)(1)(ii) lays out a servicer's obligations once it "receives a complete loss mitigation application," including providing "the borrower with a notice in writing stating the servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage." The Lorangs contend that Ditech never did that. Whether the Lorangs submitted a complete loss mitigation application is genuinely disputed. James Lorang swears that he sent Ditech all required documentation not once but twice. Yet Ditech maintains that the Lorangs never completed their application. The court cannot resolve this factual dispute at summary judgment, and as a

result, it cannot determine whether Ditech was obligated to provide the Lorangs with "notice in writing stating the servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage."

But submitting a complete loss mitigation application is only one element of the Lorangs' claim. They must also "submit[] adequate evidence of injury under [RESPA] to survive a motion for summary judgment." *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 591 (7th Cir. 2016). The Lorangs submit no evidence of actual injury. The Lorangs argue that they can wait until trial to prove damages. But they are confusing proof of the amount of damages with proof of injury. To withstand summary judgment, the Lorangs "had to come forward with evidence sufficient to support an award of actual damages to pursue their RESPA claims." *Id.* In other words, they needed to adduce evidence not just that Ditech failed to evaluate their complete application, "but specifically, that [Ditech's] failure[] to comply with [§ 1024.41(c)(1)(ii)] caused their injury." *Id.* "'[S]imply having to file suit' as a result of a loan servicer's alleged failure to [comply with] RESPA 'does not suffice as a harm warranting actual damages.'" *McNeal v. J.P. Morgan Chase Bank, N.A.*, No. 16-cv-3115, 2016 WL 6804585, at *5 (N.D. Ill. Nov. 17, 2016) (quoting *Diedrich*, 839 F.3d at 593).

Here, the Lorangs do not show evidence of any injury arising from Ditech's purported violation of § 1024.41. They contend generally that Ditech caused the Lorangs to lose their modification and the opportunity to refinance. But they attribute this injury to Ditech's failure to respond to the December 28 email, to the January 20 letter, and to Ditech's demands for inconsistent amounts due on the loan (to be discussed in the next section). At no point do the Lorangs actually show that Ditech's violation of § 1024.41—the failure to evaluate their modification application—caused them actual injury. They adduce no evidence (or even make

the argument) that had Ditech evaluated the application, they would have been approved, and that they could have made the modified payments and kept their house. Bear in mind that the Lorangs had been in default since 2009, and that they had not been able to avoid foreclosure after six years of litigation in state court. The Lorangs' injuries stem from their failure to pay their home loan and the resulting foreclosure; they have not shown how they have been harmed by the alleged RESPA violation.

In *Diedrich*, the plaintiffs alleged that the defendant prevented them from refinancing and that "as a result of [defendant's] actions," they had to contend with financial difficulties. *Diedrich*, 839 F.3d at 591. But the court held that "[e]ven taking all of the [plaintiffs'] facts as true, . . . they simply [did] not allege[] any causal connection between the injury they allege, including the claim for emotional damages, and [the defendant's] failure to respond to the qualified written request for information, as opposed to the foreclosure on their loan, the loan modification process, or the litigation in general." *Id.* at 592. The plaintiffs in *Diedrich* did not tie their damages to the alleged RESPA violation, and thus they could not survive summary judgment. So is the case here. The Lorangs cannot maintain a claim under § 1024.41, and the court will grant summary judgment in favor of Ditech on the Lorangs' RESPA claims.

## B. FDCPA

The FDCPA prohibits debt collectors from engaging in abusive, deceptive, or unfair debt-collection practices. 15 U.S.C. § 1692 *et seq*. The Lorangs contend that Ditech violated the FDCPA when it (1) refused to reasonably evaluate the Lorangs' loss mitigation application, (2) refused to provide a payoff statement, (3) refused to respond to the Lorangs' counsel's requests for information, (4) demanded inconsistent amounts due on the loan, (5) falsely represented that the Lorangs' loss mitigation application was incomplete, and (6) sent a letter

to the Lorangs in care of Krekeler Strother (the November 4 letter). Most of the Lorangs'
FDCPA contentions are harder to follow and even more conclusory than their § 1024.41
theories. The court will dispose of those that are underdeveloped, factually unsupported, or
legally unsupported. Only one claim will survive summary judgment.

The Lorangs' first contention—that Ditech "refused to act reasonably on the Lorangs'
modification request"—is conclusory and undeveloped. Dkt. 16, at 7. The court will disregard
it. "[P]erfunctory and undeveloped arguments, and arguments that are unsupported by
pertinent authority, are waived . . . ." *United States v. Hook*, 471 F.3d 766, 775 (7th Cir. 2006)
(quoting *United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000)). Tellingly, the Lorangs
say nothing about this claim in their opposition to Ditech's motion for summary judgment, so
by the time the parties completed briefing on both motions for summary judgment, the Lorangs
had abandoned the claim.

The Lorangs' second and third contentions are just as conclusory. The Lorangs do not
explain how Ditech's alleged failure to provide a payoff statement (the failure itself is disputed)
and Ditech's alleged refusal to respond to requests for information violated the FDCPA. They
summarily contend that "Ditech engaged in unfair and unconscionable behavior when it . . .
refused to provide a payoff statement . . . and refused to provide responses to the Lorangs'
attorney's requests for information." Dkt. 16, at 7. That's it. The argument is undeveloped
and, again, abandoned in the last set of briefing. The court will disregard these claims, too.

The Lorangs' fourth contention—that Ditech demanded inconsistent amounts due on
the loan—fails for different reasons. In May 2016, the state-court judgment of foreclosure
provided $387,321.77 "due to the plaintiff under the terms of the note and mortgage."
Dkt. 32-2, at 1-2. Then in September 2016, a billing statement noted a "total amount due" of

$300,942.79. Dkt. 17-2. First, it's not clear that the statements are necessarily inconsistent at all. The state-court judgment included unpaid principal, interest, negative escrow advances, property inspection fees, attorney fees, and disbursements. None of these other items (such as attorney fees, certain categories interest, or other fees that Ditech was able to recover in state court) would be on an ordinary billing statement. So the Lorangs have not demonstrated that Ditech demanded inconsistent amounts due. Second, the Lorangs received the purportedly inconsistent demand (the September billing statement) *after* they filed their complaint here. The Lorangs never amended their complaint to assert a claim based on the September statement. So the claim, even if it were factually supported, is not one that could be pursued in this case.

But the Lorangs have something with their fifth contention: they have adduced some evidence that Ditech falsely represented that their loss mitigation application was incomplete. As discussed, whether the Lorangs submitted a complete application is genuinely disputed. James's declaration testimony, if believed, would show that the Lorangs submitted a complete application, and thus that Ditech falsely stated that it was incomplete. 15 U.S.C. § 1692e(2)(A) provides that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt," including but not limited to falsely representing "the character, amount, or legal status of any debt." The FDCPA also condemns "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." § 1692e(10). Given the broad sweep of these FDCPA provisions, a false statement that the Lorangs' application was incomplete would constitute an FDCPA violation. The Lorangs' evidence on this point is not particularly strong—it relies on James's bare declaration testimony without documentary

support. But the Lorangs have adduced sufficient evidence to raise a genuine dispute of fact whether Ditech falsely stated that their modification application was incomplete.

The Lorangs' final contention fails as a matter of law. The fact that Ditech sent the November 4 letter to Marcia Lorang *in care of Krekeler Strother* does not show that Ditech violated 15 U.S.C. § 1692c(b). That section prohibits communication with unauthorized third parties about a debt. The section provides that

> without the prior consent of the consumer given directly to the debt collector, . . . a debt collector may not communicate, in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector.

To communicate with a third party, a debt collector must transfer information. Several district courts have held that an unanswered phone call is not a communication: "because [it] does not actually convey information to a third party, it does not violate the FDCPA." *Davis v. Phelan Hallinan & Diamond, PC.*, No. 15-cv-3621, 2016 WL 1078166, at *4 (D.N.J. Mar. 18, 2016) (collecting cases). For the same reason, mail sent but not received is not a communication, either. *Id.* (citing *Seaworth v. Messerli*, No. 09-cv-3437, 2010 WL 3613821, at *5 (D. Minn. Sept. 7, 2010)). It follows that communications attempted but never accomplished are not communications. Here, the Lorangs have not adduced any evidence that Ditech communicated with Krekeler Strother: they have not adduced any evidence that the firm opened the November 4 letter before forwarding it to Pagel. Instead, the Lorangs *assume* that they must have: "It is only natural to expect an attorney who received a letter directed to a former client to open that letter . . . ." Dkt. 35, at 12. But to survive summary judgment, the Lorangs must adduce evidence that could go to a jury.

More to the point, "sending a letter addressed only to the debtor to the wrong address is not a violation of § 1692c(b)." *Davis*, 2016 WL 1078166, at *5 (colleting cases). The Lorangs do not cite any case law to support their contention that sending a letter addressed to a debtor in care of the debtor's counsel's former law firm is a communication with a third party in violation of the FDCPA. The Lorangs cannot maintain a claim under § 1692c(b).

In sum, one FDCPA claim survives summary judgment: a claim under § 1692e for falsely representing that the Lorangs' loss mitigation application was incomplete.

## C. State-law claims

That leaves the Lorangs' state-law claims.

### 1. Wis. Stat. § 224.77(1)

Wis. Stat. § 224.77(1) prohibits mortgage bankers and others from engaging in certain activities. The Lorangs contend that Ditech violated subsections (k), (L), and (m) of that statute. The court takes each in turn.

The court begins with the Lorangs' claim under § 224.77(1)(L). That subsection provides that mortgage bankers may not "[e]ngage in conduct that violates a standard of professional behavior which, through professional experience, has become established for mortgage bankers, mortgage loan originators, or mortgage brokers." But the Lorangs do not develop the claim. The Lorangs do not mention subsection (L) in their briefs in support of their motion for summary judgment, and they include only a passing, conclusory reference to it in response to Ditech's: Ditech's "unreasonably ineffective investigation and slow response to inquiries by the Lorangs fell below the standard of professional conduct." Dkt. 41, at 13. The argument is entirely conclusory; the court will disregard it. The Lorangs cannot maintain a claim under § 224.77(1)(L).

Next, subsection (m) provides that mortgage bankers may not "[e]ngage in conduct, whether of the same or a different character than specified elsewhere in this section, that constitutes improper, fraudulent, or dishonest dealing." The Lorangs contend that Ditech acted improperly or fraudulently when it (1) sent the Lorangs' mail to the wrong address (Krekeler Strother), even after it had notice that Pagel had moved, (2) failed to provide a payoff statement, and (3) falsely represented that the Lorangs' application was incomplete. Though the Lorangs have adduced evidence to support these contentions, they have not adduced any evidence that Ditech's actions actually harmed them, so they cannot survive summary judgment.

"Pursuant to Wis. Stat. § 224.80(2), a person 'aggrieved' by an act of a mortgage broker that is prohibited under Wisconsin Statute § 224.77(1) can bring a cause of action for damages." *Diedrich*, 839 F.3d at 594. "[A] 'person who is aggrieved' is one who suffered at least some actual injury or damage." *Avudria v. McGlone Mortg. Co.*, 2011 WI App 95, ¶ 24, 334 Wis. 2d 480, 802 N.W.2d 524. To survive summary judgment, the Lorangs must adduce evidence tying actual injury to the § 224.77(1) violations. The Lorangs argue only generally that Ditech caused them to lose their home: "the Lorangs are *aggrieved* because they may lose up to $200,000 in equity because of Ditech's *improper* handling of their modification application and requests for payoffs." Dkt. 41, at 14. But, as with the Lorangs' RESPA claims, the causal connection is too attenuated. The Lorangs' damages showing is similar to the plaintiffs' in *Diedrich*. There, the plaintiffs adduced ample evidence that they had been injured, but they could not establish a causal connection between the injury and the statutory violations "as opposed to the foreclosure on their loan, the loan modification process, or the litigation in general." *Diedrich*, 839 F.3d at 592. Here, the Lorangs have not adduced any evidence that the

fact that Ditech sent letters to Krekeler Strother (letters that the Lorangs eventually received), misrepresented the status of their application, and failed to provide a payoff statement caused the Lorangs to lose their home to foreclosure. They offer only attorney argument and speculation. Nothing more. Again, the Lorangs have demonstrated that they misunderstand their burden at summary judgment. As discussed, the Lorangs' one potentially viable RESPA claim fails because they have not adduced any evidence of actual damages attributable to that violation. The court will borrow an apt line from the *Diedrich* opinion: "For the same reasons, the claim under the Wisconsin statute goes down with the federal claim's ship." *Id.* at 593.

Finally, subsection (k) provides that mortgage bankers may not "[v]iolate any provision of this subchapter, ch. 138, or any federal or state statute, rule, or regulation that relates to practice as a mortgage banker, mortgage loan originator, or mortgage broker." When they filed suit, the Lorangs pleaded that Ditech violated subsection (k) when it violated Wis. Stat. § 138.052(7) and (7s), 12 U.S.C. § 2605(e), and Wis. Stat. § 224.77(1)(L) and (m). Dkt. 1, ¶ 38. All three causes of action are easily disposed of. The Lorangs did not develop a Wis. Stat. § 138.052 claim in their summary judgment briefing; it is waived. The Lorangs cannot prove that Ditech violated 12 U.S.C. § 2605(e) (regarding QWRs), as discussed above. And the Lorangs do not have an actionable claim under either Wis. Stat. § 224.77(1)(L) or (m).

In their briefing, the Lorangs also contend that Ditech violated RESPA and HAMP regulations. The subsection (k) claim based on violations of 12 C.F.R. § 1024.41 fails because the Lorangs cannot prove that those violations caused actual damages. And the subsection (k) claim based on violations of HAMP regulations fails because the Lorangs do not explain how Ditech violated HAMP. The Lorangs spend their time arguing that § 224.77(1)(k) provides a cause of action for HAMP violations. But they never explain *how Ditech violated HAMP*; they

contend only that Ditech violated rights that exist because of HAMP. Dkt. 41, at 13. This oversight is dooms this theory.

The court will grant summary judgment in favor of Ditech on the Lorangs' Wis. Stat. § 224.77(1) claims.

### 2. Breach of implied duty of good faith and fair dealing

Finally, the Lorangs contend that Ditech breached its duty of good faith and fair dealing when it failed to provide a payoff statement.[7]

Under Wisconsin law, every contract contains an implied duty of good faith in its performance and enforcement. Wis. Stat. § 401.304; *see also Foseid v. State Bank of Cross Plains*, 197 Wis. 2d 772, 541 N.W.2d 203, 213 (Ct. App. 1995). A breach of the implied duty of good faith is a breach of the contract. *Foseid*, 541 N.W.2d at 212 ("[A] party may be liable for breach of the implied contractual covenant of good faith even though all the terms of the written agreement may have been fulfilled.").

Precisely what the implied duty of good faith requires is not easily defined. To put it generally, "[t]he implied covenant of good faith prevents parties to a contract from 'intentionally and purposely do[ing] anything to prevent the other party from carrying out his or her part of the agreement.'" *Non Typical Inc. v. Transglobal Logistics Grp. Inc.*, No. 10-cv-1058, 2011 WL 1792927, at *6 (E.D. Wis. May 11, 2011) (quoting *Tang v. C.A.R.S. Prot. Plus, Inc.*, 2007 WI App 134, ¶ 41, 301 Wis. 2d 752, 734 N.W.2d 169). The implied duty guards against conduct that would amount to "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and

---

[7] The Lorangs do not move for summary judgment on this claim.

21

interference with or failure to cooperate in the other party's performance." *Uebelacker v. Paula Allen Holdings, Inc.*, 464 F. Supp. 2d 791, 803 (W.D. Wis. 2006) (quoting *Foseid*, 541 N.W.2d at 213); *see also Mkt. St. Assocs. Ltd. P'ship v. Frey*, 941 F.2d 588, 595 (7th Cir. 1991) (The implied duty of good faith "forbid[s] the kinds of opportunistic behavior that a mutually dependent, cooperative relationship might enable in the absence of rule.").

A good way to sum up these principles is this: "Under Wisconsin law, to state a claim for breach of duty of good faith, a plaintiff must allege facts 'that can support a conclusion that the party accused of bad faith has actually denied the benefit of the bargain originally intended by the parties.'" *Uebelacker*, 464 F. Supp. 2d at 803 (quoting *Zenith Ins. Co. v. Emp'rs Ins.*, 141 F.3d 300, 308 (7th Cir. 1998)).

Whether a particular act or omission breaches the implied duty necessarily depends on the terms of the contract. Conduct that the contract does not expressly prohibit may breach the implied duty, but conduct that the contract expressly authorizes or requires cannot. *See id.* The breach of the implied duty of good faith and fair dealing is not simply a catch-all that turns any allegedly unfair conduct into a breach of the parties' contract. To succeed on such a claim, the Lorangs would have to show that the alleged conduct was not actually addressed in the contract itself, and they would have to explain how the alleged conduct actually deprived them of the benefit of the bargain. The Lorangs have done neither. They have not even put either the promissory note or the mortgage into evidence, so that the court could view the alleged conduct in the context of the parties' agreements.

The Lorangs rely almost entirely on an unreported Wisconsin Court of Appeals case that held that a failure to provide a payoff statement may breach the implied duty of good faith. *See Deutsche Bank Nat'l Tr. Co. v. Pauk*, 2012 WI App 73, ¶ 51, 342 Wis. 2d 248, 816

N.W.2d 350 ("[T]he Bank engaged in a pattern of inaction and a lack of diligence by failing to timely provide Pauk with a document that only the Bank could provide, . . . the Bank knew or should have known that the document would be essential for Pauk to close the sale of her mortgaged property, and . . . the length of the delay was unreasonable and well outside industry standards.") (unpublished table decision). Even if *Pauk* were authority that this court would rely on, the case is distinguishable. The bank in that case engaged in a pattern of inaction, and Pauk showed that the bank had denied her a document that was critical for her to sell the mortgaged property. But the Lorangs have not shown that the denial of the payoff statement actually prevented the Lorangs from paying off the loan or securing other financing. James says he was confused about the amount owed, but that information was available to him from many sources. And he might have needed a formal payoff statement to close on alternative financing, but he did not need a payoff statement to arrange such financing. The Lorangs present no evidence at all that they had alternative financing available, or that the lack of a payoff statement prevented them from getting alternative financing.

The court will grant summary judgment to Ditech on the Lorangs' claim for Ditech's breach of the duty of good faith and fair dealing.

ORDER

IT IS ORDERED that:

1. Plaintiffs James and Marcia Lorang's motion for summary judgment, Dkt. 15, is DENIED.

2. Defendant Ditech Financial LLC's motion for summary judgment, Dkt. 37, is GRANTED in part and DENIED in part. Plaintiffs' RESPA claims, Wis. Stat. § 224.77(1) claims, and breach of the implied duty of good faith and fair dealing claim are dismissed with prejudice. Plaintiffs' FDCPA claims, with the exception of

one claim under 15 U.S.C. § 1692e, are dismissed with prejudice. Plaintiffs' FDCPA claim under 15 U.S.C. § 1692e remains for trial.

Entered September 5, 2017.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge